IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(NORTHERN DIVISION)

| | |
|---|---|
| JIMMIE PEARSON *et. al.* <br> For themselves and on behalf of all similarly situated individuals, <br><br> Plaintiffs, <br><br> - Versus - <br><br> PROFESSIONAL 50 STATES PROTECTION, LLC.*et. al.* <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No.: 1:09-cv-03232-JKB <br> ) <br> ) <br> ) <br> ) |

**SECOND JOINT MOTION FOR APPROVAL OF SETTLEMENT**

The Parties submit this Second Joint Motion for Approval of Settlement in accordance with the Court's June 29, 2012 Order and in further support of the Settlement Agreement. The Parties state as follows:

**III.     THE PROPOSED AGREEMENT IS FAIR AND REASONABLE.**

This Court may approve the Settlement Agreement upon a determination that it is a fair and reasonable resolution of a *bona fide* dispute over FLSA provisions. *See, e.g., Lynn's Food Stores, Inc. v. United States,* 679 F.2d 1350, 1355 (11th Cir. 1982). For the reasons set forth below, the parties submit that the terms of the Settlement Agreement are fair, adequate, and reasonable and confer a substantial benefit upon Plaintiffs. *See* Settlement Agreement attached as Exhibit 1.

The current controversy was characterized by various procedural obstacles that while not unique in FLSA litigation, are nonetheless uncommon. Essentially this controversy went through

1

three stages of litigation. The first stage was characterized by the entering of an Order of default by the Court after the Plaintiffs initiated this litigation. The second stage began when the Order of default was lifted and Plaintiffs and Defendants engaged in some documentary review and agreed to a mediation plan, which did not come to fruition. The third stage began after the parties informed the Court that Defendants' were not in possession of all payroll and time keeping records for the relevant time period. The parties thereafter concentrated their efforts on a focused discovery period, which included reviewing documents and deposing Defendant Alphonso Tillman and the corporate designee.

After intense disagreement over the nature and scope of the damages, the parties were able to bridge their differences upon deposing Defendants and upon a more thorough review of the DOL investigations, which were made available in the third stage of this litigation. As is explained below, DOL investigations resulted in the assessment of penalties that averaged $200.00 per individual. The DOL did not recover any liquidated damages.

Moreover, DOL investigation summaries could be interpreted to support both parties' contentions. For the Defendants, the investigation summaries could be interpreted as offering support to their claim that the payroll period encompassed days in a third-week, so that the actual time shown in a pay period did not reflect two workweeks of 40-hours each, but rather two workweeks and additional time from a third workweek. For the Plaintiffs, the DOL investigation summaries revealed that there were irregularities in Defendants' pay practices. In fact, Defendants were ordered to make back wages payments. The DOL investigations also revealed that there were occasions where Defendants' practice of issuing paychecks for a pay period that extended beyond two-weeks did result in the failure to pay about 2-hours of overtime in a pay period.

Defendants also raised another issue at the third stage of this litigation. Defendants maintained that many of the opt-ins were never employed by Professional 50 States Protection, LLC, but rather had been employed by Remote Surveillance Technology Solutions, Inc., a defunct and dissolved corporation. The parties intensely disagreed over the status of Professional 50 States as a successor entity to Remote Surveillance Technology Solutions, Inc. Ultimately, the parties reached settlement terms that spanned a three-year period of time, included the employees of Remote Surveillance Technology, and calculated back-wages' owed using DOL findings.

The Settlement Agreement represents a significant success for Plaintiffs. In the absence of specific, detailed daily time records, the measure of damages is beyond an exacting measurement under any analysis. Therefore the parties relied on the best evidence available to them, which included DOL investigation files, to determine the measure of damages. Relying on the best available evidence it can be argued that Plaintiffs have received the maximum back wages due and owing to them. Beyond the measure of back wages due, Plaintiffs secured recovery for the broadest possible class – three years, plus the prior entity's employees. Lastly, the payout is rooted in fairness, by giving to those individuals who worked less than six-months $200.00 (the average amount determined to be owed by DOL) and $300.00 to those who worked more than six-months. It appears - based on DOL investigation - that Plaintiffs have received the maximum amount of recovery available. Furthermore, most, if not all, opt-in Plaintiffs have received their back wages in full, plus an additional amount that represents a payment of liquidated damages. The parties offer further support below that that the Settlement Agreement is fair and reasonable.

    **A.**    **Back Pay Liability.**

Plaintiffs based their wage claims on the contention that Defendants willfully failed to pay them a premium for overtime hours worked. Defendants counter that the decision not to pay the overtime premium was not willful. Investigations conducted by the DOL have been interpreted by both parties to support their positions. One of the investigations found a total of 32 employees were owed a total of $7,209.96 which is an average of about $225.00 per employee. *See* Exhibit 1, DOL investigation dated September 14, 2010. The second investigations found a total of 14 employees were owed a total $4,792.50 of which is an average of $342.32 per employee. *See* Exhibit 2, DOL investigation dated February 8, 2011.

The DOL's findings and prior payouts serve as the basis for the current Settlement Agreement. The Settlement Agreement will distribute a total of $19,000 to the Plaintiffs as follows: $200 for the opt-ins that worked for less than six months and $300 for those who worked for more than six months. The proposed payout is rooted in the DOL findings and computations of back-wages. *See* Distribution Chart, attached as Exhibit 3; *See also Concepcion et al., v. Amtec, LLC et al.*, 1:08-cv-08853-HB (S.D. NY 2009) settlement attached as Exhibit 4.

    **B.**    **Discovery Disputes.**

The Parties engaged in discovery, both formal and informal, including the depositions of the individual Defendant and corporate designee. Numerous payroll documents were reviewed. The nature of the documentation was such that the parties could not draw definitive conclusions solely from these documents. While expert forensic accountants were originally consulted their offered services were cost prohibitive in the context of this controversy (exceeding $25,000.00), and they only offered to approximate damages based on assumption of a representative sampling. As a result, further review and extrapolation from the DOL reports and the payroll and time

records that were turned-over ultimately became the bases for the negotiated settlement. The discovery disputes in this controversy were many as is demonstrated by the Court's docket.

Further, the nature of the relationship between Professional 50 States Protection and Remote Surveillance Technologies would have been subject to intense document review. The question of successor liability would have ultimately been a question for the jury. The cost of litigation associated with this issue would have consumed the measure of damages for the opt-in Plaintiffs who were employed by Remote Surveillance Technologies. This disputed issue was resolved through compromise, with Defendants agreeing to include those employees in the Settlement Agreement.

### C.    Litigation Expense and Payment of Judgment.

One significant consideration facing Plaintiffs here was Defendants' ability to pay the expense of protracted litigation and a potential maximum award following a trial on the merits. These concerns were only exacerbated when during settlement negotiations it became obvious through Defendants' representations that their ability to pay a judgment and the full costs of litigation was unlikely. Assuming *arguendo* that Plaintiffs were ultimately able to obtain all that they sought in their Complaint, the fact that they would have to endure a protracted effort to recover any such judgment was opposite to their best interest of a more expedited resolution of the lawsuit, and ever growing costs of litigation including attorneys' fees.

### D.    The Settlement Sum.

The Parties compromised and Defendants agreed to pay to plaintiffs $60,000.00. *See* Distribution Chart, attached as Exhibit 3. The distribution is as follows: $19,000 to the Plaintiffs broken down to $200 for the opt-ins that worked for Defendant less than six months, $300 to those that worked more than six months, $800 to named Plaintiff Charles Streeter and $2,500 to the other named Plaintiff Jimmie Pearson. The nature of the claims in this controversy and the

fact that the settlement covers a 3-year look back-period and that in fact prior payments had been made to many individuals as a result of the DOL investigation, coupled with the uncertainty of litigation and the economic wellbeing of Defendants militates strongly in favor of the settlement of this controversy. By way of comparison, the outcome in this controversy is far more favorable than the outcome of Lynn's Food Stores, which recognized a role for less-than-full-value compromise in the FLSA settlement process. *See, e.g., Alleyne v. Time Moving & Storage Inc.,* 264 F.R.D. 41, 57-58 (E.D.N.Y. 2010) (approving settlement of FLSA claims at 13-17% of maximum recovery).

      E.     **Prospective Wage Benefits.**

In addition to the two incentives identified above, the Plaintiffs have altered the Defendants' payroll practices. By initiating this litigation, and by bringing about changes in the Defendants' payroll practices, Plaintiffs have accorded a benefit to the American public by securing the wages for a group of laborers working in the security protections services industry. What's more, Plaintiffs have secured increased wage benefits for Defendants current and former employees. While those amounts cannot be calculated with certainty, an estimation of the benefits can be made by looking at scope of the class in this action. Thus, should Defendants employ an amount of security guards equal to those who opted-in to this controversy over the next three-years a significant prospective wage benefit will be accorded to them as a result of this litigation that is at least equal to the benefits accorded under the Settlement Agreement. *See Smile et al., v. Comcast* et al., 1:07-cv-03231 (E.D. Ill. 2009) (recognizing the value of prospective benefits in settlement).

      F.     **Compromise of Attorneys' Fees.**

From the outset of this litigation, Plaintiffs' Counsel provided quarterly statements to Defendants identifying their loadstar in this controversy. Thus, even prior to the initiation of

settlement discussions, Defendants had been presented with a separate accounting of Plaintiffs' attorneys' fees. Nonetheless, Plaintiffs' Counsel reduced their fee to $41,000.00 which includes costs for this litigation.

Plaintiffs' Counsel expended a total of 363.5 (Mr. Akaras 97.7 x $609.00 per hour and Mr. Feldman 265.80 hours X $374 per hour) hours in this controversy for a total of $158,908.50 based on Laffey-Matrix rates for the DC metropolitan area. *See* attached affidavits attached as Exhibit 5[1]. Nonetheless, Plaintiffs' Counsel reduced their fee to $41,000.00, which constitutes approximately 25% of their customary loadstar fee. As such, the hourly rate in this controversy amounts to $112.79, a rate far below the DC metro market rate.

It is long established that in FLSA cases, attorneys' fee awards are not based on a percentage of the award but upon the loadstar. *See Bonnette v. California Health and Welfare,* 704 F.2d 14665, 1473 (9th Cir. 1983) (awarding $100,000.00 in attorneys' fees although damage award was only $18,455.00); see also *Moore v. Gupta et al.,* 2010 WL 4683813 (M. D. Fla.) (agreed upon attorneys' fees and costs were never (and are not) a percentage of any total recovery in this case such that there is no correlation between the amount of monetary consideration being paid to Plaintiff and the amount of attorneys' fees and costs being paid by Defendant on Plaintiff's behalf). When all factors are considered, the quarterly billing statements, the successful opt-in rate, the back-wages and prospective value, the attorneys' fees sought by Plaintiffs' Counsel are reasonable. Furthermore, the attorneys will receive their fees in monthly installments over a two-year time period, thereby saddling them with additional risk in a controversy where their efforts secured unquestionable success for all Plaintiffs and opt-in Plaintiffs.

Respectfully submitted,

---

[1] Plaintiffs' attorneys are submitting their detailed billings entries separately for in camera review.

| | |
|---|---|
| /s/ | /s/ |
| Michael J. Snider, Esq., #24695 | Andreas N. Akaras, Esq., #14290 |
| Allan E. Feldman, Esq., #17092 | The Akaras Law Offices |
| Snider & Associates, LLC | 4423 Lehigh Road, #308 |
| 104 Church Lane, Suite 100 | College Park, MD 20740 |
| Baltimore, MD 21208 | 301-864-7763 phone |
| 410-653-9060 | akaras@akaraslaw.com |
| 410-653-9061 fax | |
| mike@sniderlaw.com email | Attorneys for Plaintiff |

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2012, a true and correct copy of the foregoing document was filed electronically. Notice of the filing was sent by operation of the Court's electronic filing system to all counsel of record. Parties may access this filing through the Court's electronic filing system.

/s/
Allan E. Feldman, Esq.